IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ALAN F. DEAN,<br><br>Appellant. | No. 86607-9-I (Consolidated with No. 86972-8-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — In 2020, law enforcement arrested Alan Dean for premeditated murder in the first degree for a "cold case" committed in 1993. Dean asserted an "other suspect" defense at trial. The jury found Dean guilty and he was sentenced to 320 months. Dean appealed, claiming (1) the trial court violated his right to due process by admitting his involuntary statements; (2) the court denied Dean his constitutional right to present a defense; (3) Dean was denied effective assistance of counsel; (4) the State engaged in prosecutorial misconduct; (4) the trial court violated Dean's right to confront a witness; (5) Dean was deprived of a fair trial due to cumulative error; and (6) the trial court erroneously entered community custody conditions that exceeded the statutory maximum. We conclude the trial court did violate Dean's right to confront a witness, but because overwhelming evidence of Dean's guilt existed, the error was harmless. Because the trial court also erred when imposing the community custody conditions, we remand to strike the term of community

custody and impose conditions consistent with RCW 9.94B.050(2)(b) but otherwise affirm.

FACTS

<u>Background</u>

In 1993, M.L. was fifteen years old and lived in Bothell, Washington, with her mother, Sharon,[1] her younger sister, K.L., and her mother's fiancé, Gary McClellan. On the evening of April 13, 1993, M.L was home alone with plans to have a friend spend the night. M.L. spoke with her mother on the phone around 9:30 p.m. and said everything was fine. When Sharon and McClellan returned home around 2 a.m., they found the door kicked in, the house in disarray, and M.L. missing. Sharon later indicated that she did not immediately call police because M.L. had run away in the past. The next afternoon, around 1:45 p.m., Sharon became worried about M.L. and called law enforcement to report her missing. That same afternoon, April 14, 1993, M.L.'s body was found below the Edgewater Creek Bridge in Everett.

On the morning of April 15, 1993, law enforcement went to Sharon's house to take statements from Sharon and McClellan and conduct a search of the house. By that time, Sharon had cleaned the house. In M.L.'s bedroom, detectives found a day calendar in the trash. An entry on March 14, 1993, read "Met Alan on Nightline[2] over the phone." Entries on March 15 and 16 indicated

---

[1] To protect the identity of the victim, we use Sharon's first name only.

[2] Nightline was "a chat line where people could talk to strangers in an anonymous fashion, leading to potentially meeting up in-person." M.L.'s friends confirmed that M.L. was a user of the service.

M.L had met with Alan in person.

The day planner also included phone numbers for "Michael" and "Nightline."  On May 18, Detective Greg Rinta called the phone number for Michael.  The man who answered identified himself as Alan and said no one named Michael was associated with that number.  Alan agreed to speak with Detective Rinta.  Detective Rinta met with Alan—later identified as the defendant Alan Edward Dean—at his home, which was less than four miles from where M.L.'s body was found.  Detective Rinta showed Dean a picture of M.L., and Dean recognized M.L. as someone he had met through Nightline and dated "once or twice" in March 1993.  Dean told Detective Rinta that he went by the name "Mike" when using the chat line.  Dean denied ever having sex with M.L.

Law enforcement also interviewed T.P., who dated M.L. for about a year around the time of her death.[3]  At the time of M.L.'s death, T.P. was 16 years old and lived in Edmonds with his family.  On the night M.L. disappeared, M.L. and T.P. argued on the phone.  T.P. told M.L. she was "marked."[4]  T.P. was a person of interest, but law enforcement did not have enough evidence to arrest him.

<u>DNA and Arrest</u>

In April 1993, Dr. Eric Kiesel conducted a formal autopsy on M.L.'s body.  Dr. Kiesel detected an odor consistent with ether coming from her body.[5]  Greg

---

[3]  The record is unclear about when exactly T.P. and M.L. broke up.

[4]  According to T.P., "marked" meant "threaten to kill somebody or something."

[5]  Ether is a hydrocarbon compound that was used as a general anesthetic until the early 1960s.  It is now primarily used as a carburetor cleaner.

Frank, a forensic scientist, performed testing on stains extracted from M.L.'s shorts and underwear. The stains tested positive for blood and trace amounts of acid phosphates,[6] but negative for spermatozoa. This was the extent of testing done in 1993.

In 2001, Frank tested the stains for DNA. One of the stains contained DNA from two sources—one was M.L. and the other was an unknown male. The unknown male source was run through the Combined DNA Index System (CODIS), a state and national DNA profile repository. At the time, the database included the DNA profile of M.L.'s on-and-off boyfriend, T.P. No matches to any profiles stored in CODIS, which included T.P.'s, were returned.

In 2019, detectives employed genetic genealogy testing to compare the DNA found on M.L.'s clothing to DNA profiles in a publicly available database. From this process, detectives identified Dean as a potential source of the DNA. The Snohomish County Sherrif's Department attempted to get a sample of Dean's DNA via a covert operation.

Undercover officers went to Dean's house posing as market researchers sampling chewing gum. Dean engaged with the "researchers" and tried the gum, but he did not allow them to take his used sample. He asked the officers, "You're not trying to collect my DNA; are you?" Dean was pleasant during the interaction and was able to articulate his position clearly. The detectives noted Dean made various anti-government statements, including telling the officers he was aware

---

[6] An acid phosphate test can detect the presence of some liquids, such as semen and vaginal fluids.

that government agents might attempt to obtain DNA samples and alluding to the officers being "dark agents of the State." The detectives believed his views were extreme, but not outlandish. At no time did Dean indicate he was unwilling to talk to them.

Detectives continued to surveil Dean, and in April 2020, they collected a cigarette that Dean had discarded on the roadway near his home. The DNA on the cigarette matched the unidentified male DNA on M.L.'s clothing.

Law enforcement arrested Dean in July 2020. Dean cooperated with the officers, but stated, "I'm not going to enter into any contract," and told the officers they were interfering with interstate commerce. Based on Dean's comments, the arresting officer believed Dean was a proponent of the sovereign citizen movement.[7] After the arrest, detectives searched the home where Dean lived. In the garage, detectives found several items containing ether and heptane.[8]

Officers transported Dean to the Sherrif's Office, where he met with detectives in an interview room. Detectives read Dean his *Miranda*[9] rights and asked if he understood. Dean replied, "No." The detectives asked Dean what he did not understand and how they could help him understand. Dean repeated the following statements after each inquiry: "I decline any and all offers of contract, and I don't concede to any presumptions," and "I comprehend you're just trying to

---

[7] Sovereign citizens believe they are exempt from federal, state, and local laws.

[8] At the time, Dean rented a room in a house, and the garage was a shared living space.

[9] *Miranda v Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

do your job, but I can't make any legal determinations on any of the questions that you're asking me." Detectives informed Dean that he had been arrested for murder in the first degree and kidnapping in the first degree arising from a 1993 case. The detectives let Dean know they were going to take a DNA sample, advised him that the room was being recorded, and then left to gather the materials needed to collect a sample of his DNA. After the detectives left the room, Dean whispered, "I knew that's what this is about." Then he looked at the ceiling and said, "I'm sorry."

The DNA obtained from Dean after his arrest was compared with the DNA found on M.L.'s clothing. While another male's DNA was detected in trace amounts in one of the blood stains on M.L.'s shorts, Dean's DNA matched every sample taken from M.L.'s clothing from which scientific comparison could be conducted, including the stain found on M.L.'s underwear. Dean did not rebut the DNA evidence at trial, but he did elicit testimony from Frank that DNA, including DNA deposited by semen, could remain on clothing through up to six wash cycles.

<u>Competency</u>

After detectives received a DNA sample from Dean, he was transported to the Snohomish County Jail for booking. During the booking process, a nurse reported Dean was "alert and oriented times four with no acute distress." The next day, a mental health professional (MHP) met with Dean and noted Dean was "curled up in his blanket . . . look[ing] around the room and would not really engage with [me]." Dean made several incoherent statements and declared he

6

had "been tortured because [he doesn't] want to say what they wanted [him] to say." At Dean's arraignment on August 18, 2020, the court expressed concern about Dean's mental competency. The State asserted, "It doesn't appear to me that this is a situation where the defendant does not understand. It's more of a situation where he protests and refuses to acknowledge." The court disagreed, noting Dean did not "seem to be tracking," and ordered a competency evaluation.

Dean refused to meet with the evaluator. At a subsequent hearing, the State recommended that Dean be transported to Western State Hospital (WSH) so he could be evaluated under 24/7 care. Dean remained at the jail until September 22, 2020, when the jail called a medical emergency because Dean was "hard to get to respond and his color was grey blue." The jail sent Dean to a local hospital where a clinician noted Dean was having paranoid ideation about food and had not eaten in several days. Several days later, a provider at the hospital relayed to the jail that Dean's condition had improved, and they did not believe psychiatric intervention was warranted at that time. Dean returned to jail.

On October 6, 2020, Dean screamed at a jail nurse and claimed the medications were poisoning him. Two days later, Dean was admitted to WSH for a competency evaluation. Dean was uncooperative in the interview, and when told his attorney would be present, Dean stated, he's "not [my] attorney. . . . He's posing, he's a pretender." Dean's competency evaluation stated that, "although some of his beliefs may be tied to anti-government conspiracy theories or ideologies, his thought processes are notably disorganized and tangential." Additionally, the evaluation noted that Dean was "paranoid upon evaluation,

7

guarded to give information, and delusional." The evaluation concluded by stating Dean's "diagnostic picture remains relatively unclear," but offered a diagnosis of "Unspecified Schizophrenia Spectrum Disorder . . . as well as an Unspecified Personality Disorder, with Antisocial and Paranoid Traits." Dean was deemed not competent to stand trial.

In November 2020, the court held a *Sell*[10] hearing and concluded Dean could be forcibly medicated. Dean remained at WSH for almost two years, a period which included two competency restorations followed by a civil commitment. During this time, Dean's evaluations varied concerning the etiology of his symptoms:

> [S]ome providers not[ed] his symptoms were consistent with a schizophrenia spectrum disorder, other providers noting his presentation was consistent with a personality disorder and beliefs consistent with sovereign citizenship, and other providers conceptualizing the etiology of his symptoms and behaviors as both schizophrenia and a personality disorder, and with one forensic evaluator providing a diagnosis of schizophrenia and rule-out of neurocognitive disorder.

In August 2022, WSH discharged Dean, and he returned to the Snohomish County Jail. In February 2023, Dean participated in a neuropsychological evaluation, and it was determined Dean did "not appear to be encephalopathic[11] at [the] time as he did not present as confused and he was fully oriented." Subsequently, the court ordered another competency evaluation, and Dean was deemed competent to stand trial.

---

[10] *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003).

[11] "Encephalopathic" refers to a state or condition in which the brain is affected by disease, damage, or dysfunction, leading to altered mental function.

Motions in Limine

1. Statements by Dean

In February 2024, the court held a CrR 3.5 hearing to determine whether statements made by Dean during the gum ruse, his arrest, and post-arrest interview were admissible.  The court concluded that all statements were made voluntarily and free of coercion.  Concerning the statements Dean made in the interview room after his arrest, the court concluded,

> Under the totality of the circumstances, it does not appear to the Court that his mental illness, to the extent he had one, interfered with the voluntariness of those statements.  The court finds that there was no Miranda violation, they went through the proper process, they were not questioning him, and that those statements are admissible under [CrR] 3.5, as they were the result of a voluntary, spontaneous utterance on his part.

2. Testimony of Dr. Barry Logan

In March 2024, the court heard arguments from the parties concerning the State's motion to allow expert testimony from Dr. Barry Logan.  The State sought to have Dr. Logan testify about the results of the chemical analysis of M.L.'s autopsy.  Dr. Logan was the state toxicologist in 1993 and was involved with testing blood samples taken from M.L.  Two sets of tests were done on M.L.'s blood.  The first round of testing was performed by analyst John Larson.[12] Larson created a draft report based on the printouts from the testing instruments and compiled both the report and the printouts for Dr. Logan to review.  Larson's report indicated that M.L.'s blood contained acetone.  After reviewing the raw data and Larson's report, Dr. Logan concurred with Larson's assessment.

---

[12] Larson was deceased at the time of trial.

Dr. Logan communicated with Dr. Kiesel, who had performed the original autopsy, about the results. Dr. Kiesel told Dr. Logan that he believed it was ether, not acetone, present in M.L.'s blood. Based on this feedback, Dr. Logan redesigned the test so it could differentiate between acetone and ether. Larson again ran M.L.'s blood sample. Dr. Logan was present for some of this testing. Dr. Logan reviewed the instrument data from this round and concluded M.L.'s blood contained ether rather than acetone. Dr. Logan also signed off on the final report. The court concluded Dr. Logan's testimony did not present a confrontation clause issue and granted the State's motion.

### 3. Graffiti Evidence

Dean brought a motion to admit photographs taken by law enforcement in 1994 of graffiti discovered on the walls of a backyard shed at T.P.'s home. The photographs were taken in 1994, when the bank repossessed the home and alerted law enforcement to the existence of the graffiti. The photographs Dean sought to admit depicted graffiti with the following statements: (1) "[T.P.] wants [M.L.] dead!!"; (2) "I'll be dead soon, 6 ft. under" (stick figure in a coffin); and (3) "[M.L.] is gonna die soon." (smiley face).[13] The State asserted that the graffiti appeared to be in at least three different people's handwriting. During pretrial interviews, both T.P. and M.D. stated they did not create the graffiti, nor did they know who wrote it. M.D. noted some of the handwriting looked feminine and admitted it could have been her.

---

[13] The graffiti in (3) above used the first name of M.L., but it is unclear to whom this statement referred given this first name was shared by M.D., T.P.'s girlfriend at the time of M.L.'s death.

Dean claimed he was offering the photographs as proof that T.P. put a hit on M.L.  The court concluded the statements were hearsay and no exception existed.  In a motion for reconsideration, Dean argued the writings were admissible for the purpose of impeaching law enforcement's investigation.  He maintained detectives "cleared" T.P. before the writings were found, and the investigation efforts concerning T.P. were minimal.  The court denied Dean's motion.

### 4. Other Suspect Evidence

Dean also sought to admit testimony that T.P. was abusive towards his girlfriend, M.D., as part of his "other suspect" defense.  In a pretrial interview, M.D. stated T.P. choked her "a couple of times."  Dean contended this evidence went to T.P.'s intent, motive, and modus operandi underlying his alleged murder of M.L.  The court allowed the evidence, noting Dean satisfied the ER 404(b) requirements.[14]

The State filed a motion asking the court to reconsider.  During the hearing, Dean offered a new, non-propensity, basis for admission: consciousness of guilt.  Dean told the court he expected M.D. to testify about an incident that occurred while she was dating T.P., where T.P. and a friend, E.C., took her out in the woods behind T.P.'s house and tied her to a tree, then the

---

[14] To admit evidence of the defendant's prior misconduct, " 'the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.' " *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

friend put his hands around M.D.'s neck, and T.P. said, "Do you want to die like [M.L.] died?"

The court considered both the State's motion for reconsideration and the newly offered evidence of the incident in the woods. The court reversed its original order allowing the admission of evidence of T.P. choking M.D., noting, "the case law is clear that this does not fit MO, modus operandi, because it's not so distinctive and unusual of a manner of assaulting or attempting to kill someone that it would justify admitting the prior misconduct." But, with regard to the incident with T.P., E.C., and M.D. in the woods, the court found its probative value outweighed the prejudice and allowed its admission.

5. Autopsy Photographs

The State sought to admit 16 photographs from M.L.'s autopsy. The State maintained the photographs selected offered "a very particular and specific thing, clothing that the victim was wearing, the injuries to her throat from various angles, the face shot for identification, and the condition of her various limbs and back and torso." The court granted the State's motion, noting it did not "believe that they are so shocking under [ER] 403 as to be unfairly prejudicial, and they're directly relevant to the State's burden in this matter."

Trial

At trial, Dean's theory of the case was that T.P. was responsible for M.L.'s death. Sharon described M.L. and T.P.'s relationship as "volatile," and noted she did not like the way T.P. treated M.L. She testified that shortly before M.L.'s death, T.P and M.L. broke up. She stated that on the day of M.L.'s death, M.L

called her at work and told her that T.P. "was going to come and kill her [M.L.]."[15]

At the end of Sharon's direct examination, the State handed her what had previously been admitted as Exhibit (Ex.) 29—an autopsy photograph of M.L.[16] The photograph depicted M.L.'s face. M.L.'s eyes were closed, her mouth sightly open, and red ligature marks were visible on her neck. The State questioned, "I'm going to ask you to take a look at [the photograph], and I'm going to ask you to indicate for us whether this is, in fact, a photograph of your daughter [M.L.], okay?" Sharon replied, "Oh, my God. It's her." The State ended its direct examination and the court turned to Dean for cross-examination. Before Dean's attorney began cross-examination, he stated, "Your Honor, I'll just ask, if [Sharon] needs a few minutes, that would certainly be understandable." Sharon indicated she was ready to continue, but after a few moments, Dean noted, "Your Honor, I know [Sharon] has indicated that she's all right, but I do wonder if this would be an appropriate time for the afternoon recess, as I do see that she is still understandably upset and tearful."

The court recessed and Dean moved for a mistrial. Dean noted Sharon had already been shown several photos of M.L., and no apparent need existed for the State to show her the final autopsy photo. Dean claimed,

> It was clearly a ploy that was meant to derail cross-examination. It puts defense in a terrible light before the jury to ask her really anything about [M.L.]. It was clearly designed to enflame

---

[15] Neither Sharon's initial report to police nor her written statement included this fact.

[16] Before showing Sharon the photo, the State approached Dean's counsel and confirmed it was going to present the photo to Sharon. Dean's counsel did not object.

> the passions of the jury. [Sharon], upon seeing the photo shouted,
> "Oh, my God," and burst into tears.

The State countered that it was appropriate to "close the circle" by having Sharon identify the individual in the photograph. The State also noted that it had told Sharon that morning it would be showing her autopsy photographs.

The court concluded there was a legitimate basis for the State to show the photograph and noted, "while it's unfortunate the witness had a – an emotional reaction, which is understandable, to it, it was not so overblown that it can't be, with a break, overcome." After the recess, Sharon returned to the stand and Dean conducted cross-examination with seemingly no issues.

Later in trial, the State showed Dr. Kiesel the same photograph (Ex. 29) and he explained, "this is an identification photograph that we take on all cases." Prior to deliberations, the court read the jury instructions, which included the following instruction: "You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference."

Dean called several witnesses at trial, including T.P. T.P. testified that M.L. prank-called his house the night she was killed but had little memory of much else. When asked if he had any memory of telling M.L. she was marked, T.P. claimed he did not recall making that comment. But in a written statement to law enforcement on April 20, 1993, T.P. said he had placed a tag on M.L.'s life.

T.P.'s stepbrother, A.G., testified and confirmed that T.P. had placed a hit on M.L. A.G. recalled that T.P. had told him that "he had forgotten to call off a hit" on M.L. A.G. said T.P was not planning the hit himself but had recruited

14

someone from the gang he was affiliated with to carry out the hit. A.G. testified "nothing" wound up happening with the hit and T.P. never mentioned it to him again. In his written statement to law enforcement in 1993, A.G. said, "[T.P.] did tell [M.L.] she was marked, but only after she kept calling and refused to stop."

T.P.'s father and brothers, S.P. and B.P., also testified. Neither recalled much from the night of April 13, but their statements to police on April 16, 1993, indicated that on the night of April 13, T.P. returned home around 9:00 p.m., was on the couch watching a movie at 2:00 a.m., and was asleep on the couch at 6:00 a.m. Conversely, M.D. testified that T.P. stayed at her house the night of April 13, 1993.

Dean called M.D. as a witness and asked about the incident in the woods. While describing the incident, M.D. testified it was T.P.'s friend, E.C., who asked if she wanted to die like M.L., not T.P., as Dean had indicated. The State objected and asked to be heard outside the presence of the jurors. The State noted that M.D.'s testimony was different than what was discussed during the motions in limine. During the motion, Dean had offered this incident as proof of T.P.'s consciousness of guilt because it was T.P. who said, "Do you want to die like [M.L.]" but now M.D. was testifying it was T.P.'s friend who said those words. Dean responded that in her interview with detectives, M.D. indicated it was T.P. who said those words. Dean offered two remedies: impeachment or a stipulation from the detective that during the interview, M.D. referred to T.P making the statement.

The court allowed Dean to impeach M.D., but stated, "if she does not—

15

after being confronted with her out-of-court statement—agree to that, then the matter is over." Dean responded, "And I will move on at that point." When Dean continued questioning, M.D. confirmed it was E.C. who made the statement. The State objected and moved to strike. The court sustained the objection and told the jury "to disregard the last answer with regard to who made the statement and what the statement was." The State requested that the entire portion of the testimony concerning the incident be struck; the court sustained that as well and told the jury to "disregard the entirety of that line of questioning." Dean did not object.

The jury found Dean guilty of murder in the first degree, and the court sentenced Dean to 320 months imprisonment, to be followed by 36 months community custody. Dean appealed, claiming (1) the trial court violated his right to due process by admitting his involuntary statements; (2) the court denied Dean his constitutional right to present a defense; (3) Dean was denied effective assistance of counsel; (4) the State engaged in prosecutorial misconduct; (4) the trial court violated Dean's right to confront a witness; (5) Dean was deprived of a fair trial due to cumulative error; and (6) the trial court erroneously entered community custody conditions that exceeded the statutory maximum.

ANALYSIS

CrR 3.5

Dean contends the trial court erred when it concluded that admission of the statements he made during his postarrest interview did not violate his due

16

process rights.[17]  Because Dean was not exhibiting any signs of mental illness and his statements were not coerced, the court did not err when it concluded the statements were made voluntarily.

We will not disturb a trial court's determination that a statement was made voluntarily if "there is substantial evidence in the record from which the trial court could have found by a preponderance of the evidence that the confession was voluntary."  *State v. Cushing*, 68 Wn. App. 388, 393, 842 P.2d 1035 (1993).  The due process clause of the federal and state constitutions protects individuals from convictions predicated on, in whole or part, the admission of involuntary statements coerced by the actions of a State actor.  U.S. CONST. amend. XIV, § 1, WASH. CONST. art. I, § 3; *State v. McCullough*, 56 Wn. App. 655, 658, 784 P.2d 566 (1990).  For purposes of due process, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' "  *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

Whether a statement is involuntary is determined by the totality of the circumstances.  *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).  Factors considered in the totality of the circumstances analysis include the defendant's physical condition, age, mental abilities, and conduct of law enforcement.  *State v. Rupe*, 101 Wn. 2d 664, 679, 683 P.2d 571 (1984).  While the court must consider the mental abilities of a defendant, mental illness does

---

[17]  Dean only challenges the voluntariness of statements made during his postarrest interview.  His statements made to law enforcement during his arrest are not challenged, but they are discussed to the extent they inform the voluntariness of his interview room statements.

"not necessarily require the conclusion that the confession was involuntary."
*Cushing*, 68 Wn. App. at 392-93.  Even where mental illness is a factor, police coercion must also be present for a statement to be deemed involuntary. *Connelly*, 479 U.S. at 165 ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.")

Here, Dean contends the totality of the circumstances show that he had an untreated mental illness and law enforcement exploited this condition during the July 28, 2020, interview.  Dean references his past treatment for schizophrenia, maintaining this indicates a longstanding condition,[18] and his more recent competency evaluations to support his assertion that his behavior was the product of more than anti-government beliefs.  He maintains the State had reason to question his mental condition—based on his statements during the gum ruse and his arrest—and exploited this condition by lying to him about the reason for his arrest, then "taking his incoherent statements as an invocation of his right to silence."

Dean likens his situation to *State v. Sergent*, 27 Wn. App. 947, 621 P.2d 209 (1980).  In that case, the State charged Sergent with murder in the first degree but found him incompetent to stand trial.  *Sergent*, 27 Wn. App. at 948. Sergent was admitted to WSH and the hospital administered "haloperidol (which reduces delusions and hallucinations of one suffering from schizophrenia) and

---

[18] In 2007 and 2009, Dean received services through King County Regional Support Network in relation to a diagnosis of Unspecified Schizophrenia.

Cogentin (which controls undesirable physical side effects of the haloperidol)." *Id.* A few weeks after being admitted, Sergent spoke with law enforcement on the phone and expressed a desire to enter a guilty plea. *Id.* The court held a CrR 3.5 hearing and deemed the conversation admissible. *Id.* Subsequently, the court found Sergent guilty of murder in the second degree. *Id.* Sergent appealed, contending his confession was not made voluntarily. *Id.*

On appeal, the court held, "An examination of all the circumstances surrounding the February 15 statement convinces us that the confession was involuntary." *Id.* at 949. The court noted that when Sergent made the statement to law enforcement, he was incompetent to stand trial, actively exhibiting symptoms of schizophrenia, experiencing strong negative reaction to his medications, had waived his fundamental constitutional rights without the assistance of counsel, and believed confessing would result in his transfer to prison, thereby "escaping the prescribed medications." *Id.* at 950. Additionally, the court noted the officer's questions to Sergent were "highly suggestive and leading." *Id.* at 951.

The facts here are distinguishable. Unlike *Sergent*, no evidence exists suggesting Dean was actively experiencing symptoms of mental illness during the interview. Dean had been treated for schizophrenia over ten years prior, but he had no documented treatment again until October 16, 2020, nine months after his arrest, when a psychologist deemed him incompetent to stand trial. However, when law enforcement arrested Dean in February 2020, officers noted Dean appeared to be tracking what they were saying and understood the situation.

19

Even if Dean had been experiencing mental illness symptoms, nothing in the record indicates law enforcement was aware of and exploited his mental illness.

The arresting officer believed Dean considered himself a sovereign citizen and recognized his communications as consistent with those beliefs. Dean made similar statements during his interview with Detectives Walvatne and Conley, and the detectives understood that Dean was communicating his desire to not answer questions. When Dean continued to say he "decline[d] any and all offers of contract" and he could not "make any legal determinations on any of the questions," the detectives ceased questioning him. Detective Conley told Dean what he was being charged with, informed him that he was being recorded, offered assistance if he needed anything, and left the room. The detectives did not use coercive tactics, did not threaten Dean or ask him suggestive or leading questions, and they left the room when Dean made it clear he did not want to talk.

The court's determination that Dean's statement was voluntary is supported by the record. Dean was not displaying obvious symptoms of mental illness, but even if he was experiencing a mental health issue, the detectives did not use coercive tactics. We conclude the trial court did not err when it admitted Dean's July 28, 2020, statements.

<u>Right to Present a Defense</u>

Dean contends the trial court violated his right to present his "other suspect" defense when it excluded the graffiti writings and testimony from M.D. concerning the incident in the woods. Exclusion of the graffiti writings and the

20

incident in the woods was not error because the prejudicial nature of the evidence outweighed its probative value. In addition, it was not the only evidence to support Dean's "other suspect" defense.

A defendant has the right to present a complete defense. *State v. Cayetano-Jaimes*, 190 Wn. App. 286, 297-98, 359 P.3d 919 (2015). This includes the right to present relevant, material evidence and " 'a fair opportunity to defend against the State's accusations.' " *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. Ed 297 (1973)).

We apply a two-step analysis to determine whether a defendant's right to present a defense was violated by a trial court's exclusion of evidence. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). First, we analyze the trial court's evidentiary rulings for abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). A trial court abuses its discretion if it " 'applies the wrong legal standard[] or bases its ruling on an erroneous view of the law.' " *State v. Orn*, 197 Wn.2d 343, 351, 482 P.3d 913 (2021) (alteration in original) (quoting *State v Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)). If the trial court's evidentiary ruling was an abuse of discretion, we must determine whether the error was prejudicial under the harmless error standard. *Jennings*, 199 Wn.2d at 59. "An error is harmless and not grounds for reversal if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019).

21

If the court's evidentiary ruling was not an abuse of discretion or was harmless error, we then consider de novo whether the exclusion of evidence violated the defendant's right to present a defense. *Jennings*, 199 Wn.2d at 58. First, the court must determine whether the evidence is minimally relevant. *Jones*, 168 Wn.2d at 720. Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Jennings*, 199 Wn.2d at 60 (quoting ER 401). Whether evidence is relevant is a low threshold; "[e]ven minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

If the evidence is deemed relevant, the court must then "weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 62. To justify exclusion of evidence, the State must show "the evidence was 'so prejudicial as to disrupt the fairness of the factfinding process.' " *Orn*, 197 Wn.2d at 354 (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). If the evidence is highly probative, " 'no state interest can be compelling enough' " to justify exclusion. *State v. Luna*, 5 Wn.3d 465, 507, 578 P.3d 273 (2025) (quoting *Hudlow*, 99 Wn.2d at 16). But, even if the court excludes some probative evidence, a defendant's right to present a defense may not be violated if they are still able to present evidence to support their defense. *Arndt*, 194 Wn.2d at 813-14. If the State cannot make a showing of prejudice, or if the

excluded evidence is highly probative, then the defendant's right to present a defense was violated and the harmless error standard applies.  *Orn*, 197 Wn.2d at 358.

    1.  Graffiti Evidence

Dean contends the exclusion of the graffiti writings violated his right to present a defense because the writings were relevant and highly probative of T.P.'s state of mind and, alternatively, could have been used for the purpose of impeaching the police investigation.[19]  We disagree.

    *a.  T.P.'s State of Mind*

Dean maintains the writings were relevant because sufficient evidence exists to infer the writings reflected T.P.'s state of mind.  Dean cites to testimony that the writings occurred only when T.P. or his brother were present and T.P. would have been aware of the writings.  Dean also notes that, even if M.D. created some of the graffiti (which she testified was a possibility), that would still be relevant because, as T.P.'s girlfriend, M.D. had intimate knowledge of T.P.'s state of mind.

Conversely, the State contends the graffiti evidence is only relevant if some evidence exists that the statements were made by T.P., because "[t]here is no minimal relevance in a statement made by *unknown person*, at some *unknown time* to the effect that *they personally believed* T.P. wanted M.L. dead." (Emphasis in original.)

---

    [19]  Dean does not argue the trial court's evidentiary ruling was an abuse of discretion.

The graffiti evidence is relevant because it references M.L.'s death, but evidence is not admissible if its relevance "rest[s] on theories that [are] speculative and lack[] an adequate foundation." *State v. Bass*, 18 Wn. App. 2d 760, 800, 491 P.3d 988 (2021).  No evidence exists to support that T.P wrote the graffiti.  And even if the graffiti writings were created when T.P. was present or he knew about them, that does not prove the writings were indicative of T.P.'s state of mind.  This theory is purely conjectural.  Any conclusion that it is an indication of T.P.'s state of mind is speculative and inadmissible.

Even if the evidence was relevant, the State met its burden of showing the evidence was more prejudicial than probative.  Because the authors of the graffiti are unknown, the admission of the evidence could lead the jury to speculate and make prejudicial inferences about who created the graffiti.  Dean maintains that any prejudice is negated because the prosecution would be able to emphasize to the jury that the author of the graffiti was unknown and the jury could weigh the evidence.  Dean cites to *State v. Terrovona*, for support, but in that case the declarant was known, and the jury was weighing only the inferences of action after the statements were made.  105 Wn.2d 632, 638, 716 P.2d 295 (1986).  Furthermore, exclusion of the graffiti did not deprive Dean of his ability to argue his theory of the case.  He was still able to present to the jury evidence of T.P. and M.L.'s tumultuous relationship and T.P.'s threats toward M.L., including that he put a hit on her.  For these reasons, the exclusion of the graffiti evidence did not violate Dean's right to present a defense.

### b. Impeachment of the Investigation

Dean contends the trial court abused its discretion and violated his right to present a defense by excluding the graffiti for the purpose of impeaching the police investigation.

Criminal defendants have a right to question the reliability of law enforcement's investigation. *See*, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 446-47, 115 S. Ct. 1555, 131 L. Ed. 2d. 490 (1995). When evidence is offered not for the truth of the matter asserted, but to provide context for an investigation, it is not hearsay. *State v. Iverson*, 126 Wn. App. 329, 337, 108 P.3d 799 (2005).

Here, Dean maintains the graffiti was relevant to impeach the investigation because detectives did not search the shed and, later, when they discovered the writings, they did not "reexamine [T.P.'s] alibi." Dean claims the fact that none of the witnesses interviewed in 1993, including T.P. and M.D., discussed the writings goes to their credibility and, thus, warranted reexamination of T.P.

First, the trial court never deemed the evidence to be irrelevant. The court's decision to deny the motion to admit the graffiti evidence was based on the untrustworthiness of the evidence and Dean's ability to impeach the investigation without the evidence. As the court correctly identified, the information from the statements—that T.P. wanted M.L. dead—was the same information detectives already had from witness testimony. Additionally, Dean's contention that the writings went to law enforcement's efforts because they "already cleared [T.P.] as the other suspect" is based on the false notion that T.P. was cleared as a suspect before law enforcement discovered the graffiti. The

State indicated that T.P. remained a person of interest and only "came off the radar" when the DNA profile on M.L.'s shorts was not a match to T.P.

Dean cites to *State v. Alexander*,[20] to support his argument, but that case is distinguishable. In *Alexander*, the court admitted a diary entry by the victim that indicated she was alive after the defendant left her. No. 82703-1-I, slip op. at 10. The court held the diary entry was admissible to impeach law enforcement's investigation, because they had failed to obtain video surveillance for the apartment complex after the entry was written. *Id.* But, unlike the case here, law enforcement knew about the diary entry from the beginning of the investigation, and despite one officer directing another officer to obtain the surveillance footage, it was never recovered. *Id.* at 11.

Here, nothing in the record indicates detectives should have known about the graffiti writings sooner or that the lack of such knowledge was a "failure to investigate." As Dean admits, none of the witnesses discussed the writings in the shed. Also, no evidence indicates that T.P. was "cleared" before the discovery of the graffiti, and no evidence exists to support a conclusion that law enforcement did not further examine T.P.'s alibi after the graffiti was discovered. And, as discussed *supra*, any probative value of the graffiti was outweighed by its prejudicial nature. For these reasons, exclusion of the graffiti evidence for purposes of impeaching the investigation did not violate Dean's right to present a defense.

---

[20] No. 82703-1-I (Wash. Ct. App. Apr. 3, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/827031%20Order%20and%20Opinion.pdf.

2. Incident in the Woods

Dean contends the trial court's evidentiary ruling concerning the incident in the woods was an abuse of discretion, and exclusion of the evidence violated his right to present a defense. Because Dean failed to object, he has waived this claim on appeal.

Evidentiary Ruling

A party's failure to object at trial precludes appellate review unless the error was manifest and of constitutional magnitude. *State v. Leavitt*, 111 Wn.2d 66, 71, 758 P.2d 982 (1988). Evidentiary rulings are not of constitutional magnitude. *State v. Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009).

Here, Dean did not object to the trial court's ruling to strike the entire testimony concerning the incident in the woods. Because Dean failed to object, we decline to review the issue on appeal.

Ineffective Assistance of Counsel

Dean contends he received ineffective assistance of counsel because (1) his attorney did not argue the "ancient documents" exception in support of the motion to admit the graffiti evidence and (2) his counsel failed to object to the court's ruling concerning testimony of the incident in the woods with M.D. Because the ancient documents exception does not apply, and any objection to the court's ruling concerning the incident in the woods would have been futile, we conclude Dean received effective assistance of counsel.

We review ineffective assistance of counsel claims de novo. *State v. Jones*, 183 Wn. 2d 327, 338, 352 P.3d 776 (2015). Under both the federal and

27

state constitutions, a criminal defendant is guaranteed the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Counsel for criminal defendants have basic duties, including "assisting the defendant, advocating for the defendant's cause, and utilizing 'such skill and knowledge as will render the trial a reliable adversarial testing process.' " *State v. Vazquez*, 198 Wn.2d 239, 249, 494 P.3d 424 (2021) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A defendant's right to effective assistance of counsel is violated when (1) defense counsel's performance was deficient and (2) that deficiency prejudiced the accused. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). The defendant has the burden of showing both that their counsel's performance was deficient and they were prejudiced. *Estes*, 188 Wn.2d at 458.

Counsel's performance is deficient if it "falls 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *Id.* (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). The presumption is strong that counsel's representation was reasonable, and the defendant has the burden of proving " 'the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.' " *Vazquez*, 198 Wn.2d at 248 (quoting *McFarland*, 127 Wn.2d at 336). An attorney's decision to not object during trial " 'may be a sound one on tactical grounds by competent counsel.' " *State v. Warren*, 134 Wn. App. 44, 56, 138 P.3d 1081 (2006) (quoting *State v. Madison*, 53 Wn. App. 754, 762-63, 770 P.2d 754 (1989)). When a defendant bases their ineffective assistance of counsel claim on their attorney's

failure to object, " 'the defendant must show that the objection would likely have succeeded.' " *Vazquez*, 198 Wn.2d at 248 (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)).

To show prejudice, a defendant must prove there is a " 'reasonable probability' . . . that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015) (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" is lower than a "preponderance of the evidence" standard: "[I]t is a probability sufficient to undermine confidence in the outcome." *Estes*, 188 Wn.2d at 458.

1. Graffiti Evidence

Dean contends his counsel was ineffective for failing to argue the graffiti was admissible under the ancient documents exception to hearsay. Under ER 803(16), "[s]tatements in a document in existence 20 years or more whose authenticity is established" are not excluded by the hearsay rule, "even if the declarant is available as a witness." Authenticity requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). Authenticity of an ancient document may be established by showing the document "(i) is in such condition as to create no suspicion concerning its authenticity, (ii) was in a place where it, if authentic, would likely be, and (iii) has been in existence 20 years or more at the time it is offered." ER 901(8).

Here, Dean cannot establish authenticity of the documents.[21]  Dean claims the writings are what they proport to be—threatening messages recovered from the walls of T.P.'s shed—and it is not determinative that the author of the statements is unknown.  Dean cites to *Allen v. Asbestos*, 138 Wn. App. 564, 157 P.3d 406 (2007), to support the proposition that testimony from someone with personal knowledge about the creation of the document is not required.  While *Allen* does state as much, the facts here are very different from *Allen*.  In *Allen*, the documents in question were shipyard documents either from the shipyard itself or from the national archives.  *Id.* at 576.

Not only is the creator of the graffiti unknown, but the circumstances surrounding its creation are unknown.  None of the witnesses could testify to the authenticity of the writings.  Both T.P. and M.D. had no recollection of who created the graffiti or when it was created—whether before M.L.'s death or after.  Also, while Dean contends the graffiti is what it proports to be (threatening messages), no evidence exists to support a finding these messages were written as anything other than inappropriate, childish scribbles of teenagers.  Additionally, the graffiti itself was not in existence for more than 20 years when offered at trial.  Dean offered photographs of the graffiti taken in 1994.

Because the graffiti cannot be authenticated, the ancient document exception does not apply, and Dean's counsel was not ineffective for failing to argue an exception that was futile.

---

[21]  While we do not analyze the issue because we conclude the graffiti cannot be authenticated, we do not believe the graffiti at issue here is a "document" for purposes of ER 901(b)(8).

2.  Incident in the Woods

Dean contends he was deprived of effective assistance of counsel because his attorney did not object when the trial court struck testimony from M.D. concerning the incident in the woods.  But, as discussed *supra*, the testimony concerning the incident in the woods was properly struck; therefore, any objection would have been futile, and Dean's counsel was not ineffective for failing to object.

Prosecutorial Misconduct

Dean contends the State engaged in prosecutorial misconduct when it showed Sharon the autopsy photograph of M.L. at the end of direct examination. We disagree.

Claims of prosecutorial misconduct are reviewed for abuse of discretion. *State v. Brown*, 132 Wn.2d 529, 562-63, 940 P.2d 546 (1997).  A court abuses its discretion if it " 'acts on untenable grounds or its ruling is manifestly unreasonable.' "  *State v. Hill*, 19 Wn. App. 2d 333, 345, 495 P.3d 282 (2021) (quoting *State v. Gaines*, 194 Wn. App. 892, 896, 380 P.3d 540 (2016)).  "Where the defendant moves for a mistrial based on alleged prosecutorial misconduct, we will give deference to the trial court's ruling on the matter."  *State v. Whitaker*, 6 Wn. App. 2d 1, 16, 429 P.3d 512 (2018).

To prevail on a claim of prosecutorial misconduct, a defendant must establish "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial."  *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion).  A

prosecutor's conduct is improper when they "seek[] a conviction based on emotion rather than reason." *State v. Craven*, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020).

Prejudice is established where "there is a substantial likelihood the misconduct affected the jury's verdict." *State v. Barboa*, 157 Wn.2d 108, 122, 135 P.3d 469 (2006). When determining whether a prosecutor's conduct was prejudicial, we look at the conduct "in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Here, Dean contends the State's conduct was improper because it "was an unnecessary appeal to jurors' emotions." Dean argues M.L.'s identity was verified by one of the investigating detectives shortly after Sharon's testimony and, therefore, a valid reason did not exist to show Sharon the photo. Dean maintains there is a substantial likelihood that showing Sharon the photo appealed to the jury's sympathy for M.L. and prejudiced the outcome of the trial.

While the parties may disagree whether showing Sharon the photograph to confirm M.L.'s identity was necessary, presentation of the photograph does not rise to the level of prosecutorial misconduct. First, the photograph was admitted evidence, and the State told Sharon prior to her testimony that it was planning on showing her an autopsy photo. The State also informed defense counsel before showing Sharon the photo, and defense counsel did not express concern. No evidence exists to support a finding that the State knew Sharon would react the way she did, and the court observed that, while emotional, Sharon's action was

32

not overblown.[22]  Additionally, the jury instructions reminded jurors that "[y]ou must not let your emotions overcome your rational thought process.  You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference."  And jurors are presumed to follow the court's instructions.  *Warren*, 165 Wn.2d at 28.

To the extent that Dean argues the conduct prejudiced his cross-examination, nothing in the record indicates that Sharon's testimony was affected by the photograph.  Following the recess, the court informed the parties, "I'll just indicate for the record that [Sharon] just . . . told me that she's good with a smile.  So I think we're ready to go forward."  Sharon then went on to answer Dean's questions coherently.  Because Dean cannot demonstrate how the State's conduct was improper or prejudiced him, we conclude the court did not abuse its discretion when it denied Dean's motion for a mistrial.

### Right to Confrontation

Dean contends the trial court violated his right to confront the witness when it allowed testimony from Dr. Logan concerning the testing done on M.L.'s blood, when Dr. Logan was not the one who performed the testing.  We agree.

We review a claim of constitutional violation de novo.  *State v. Hall-Haught*, 4 Wn.3d 810, 816, 569 P.3d 315 (2025).  The confrontation clause of both the federal constitution and Washington State Constitution guarantee a

---

[22]  Dean did not object to the use of the photograph when the State indicated it was going to show it to Sharon; it was only after Sharon's reaction that the Dean objected.  Dean's failure to object beforehand indicates that Dean did not have an issue with the photo itself—it was Sharon's reaction that Dean believes prejudiced the jury.

criminal defendant the right to confront the witnesses against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The confrontation clause prohibits testimonial statements "unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant." *Hall-Haught*, 4 Wn.3d at 816. The clause applies only to testimonial hearsay and " 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *Smith v. Arizona*, 602 U.S. 779, 792-92, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024) (quoting *Crawford v. Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). "A statement is testimonial if 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *Hall-Haught*, 4 Wash. 3d at 815 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). To determine whether a statement is testimonial, the court considers "whether the statement has 'a primary purpose of creating an out-of-court substitute for trial testimony.' " *Id.* at 819 (internal quotation marks omitted) (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 669, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011)).

The confrontation clause "applies in full to forensic evidence." *Smith*, 602 U.S. at 783. Under the confrontation clause, a party cannot introduce a lab analyst's written findings through the testimony of another. *Id*. at 786. When an expert bases their opinion on the out-of-court statements of another, "[t]hose statements . . . come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert." *Id*. at 803.

In 2024, the Supreme Court clarified the applicability of the confrontation clause to expert opinions based on forensic evidence the testifying expert did not create.  In *Smith*, Elizabeth Rast, a forensic analyst, performed a full scientific analysis on substances believed to be drugs.  *Id*. at 790.  After Rast completed the testing, she prepared "a set of typed notes and a signed report" documenting her "lab work and results."  *Id.*  The notes included descriptions of the items tested, the tests performed, and the equipment used.  *Id.*  The report distilled Rast's notes into two pages of ultimate findings.  *Id.*

At trial, instead of Rast, a substitute forensic scientist, Greggory Longoni, testified about the testing.  *Id.*  Longoni reviewed Rast's notes and report and came to the same conclusion as Rast.  *Id.* at 791.  Longoni testified that after reviewing the notes and report, he "form[ed] an independent opinion" as to the results.  *Id.* at 797.  The defendant, Smith, was found guilty and he appealed his conviction, contending Longoni's testimony violated his confrontation clause rights.  *Id.* at 791.  On appeal, the court upheld Smith's conviction, concluding "an expert may testify to 'the substance of a non-testifying expert's analysis, if such evidence forms the basis of the [testifying] expert's opinion.' "  *Id.* (alteration in original).

The Supreme Court reversed, holding out-of-court statements that come in for their truth cannot be used as the basis for an expert's opinion.  *Id.* at 802-03.  Because Longoni's opinion, though independently reached, could not be credited unless Rast's underlying statements were true, Longoni's opinion violated the confrontation clause.  *Id.*

A year after *Smith* was decided, the Washington State Supreme Court addressed a similar issue in *Hall-Haught*. In that case, Mindy Krantz, a forensic analyst, performed a toxicology examination of the defendant's blood sample. *Hall-Haught*, 4 Wn.3d at 814. At trial, Katie Harris, the toxicology lab supervisor, who oversaw Krantz's work on Hall-Haught's case, testified instead of Krantz. *Id.* Harris reviewed the sample testing before approving release of the test results, but she did not conduct the tests herself. *Id.* at 814, 822. Harris's testimony referred to the "toxicology test report and related items it referenced." *Id.* at 823.[23] Additionally, Harris described the scientific tools that Krantz used and confirmed the lab's standard operating procedures were followed. *Id.*

Correcting prior precedent,[24] our Supreme Court held Hall-Haught's confrontation clause rights were violated when Harris, not Krantz, testified. *Id.* The court determined that "Hall-Haught's lab reports were introduced to show the truth of what they asserted." *Id.* The court concluded Krantz, "the analyst who performed the testing and wrote the report, was the real witness against Hall-Haught." *Id.* at 825.

Here, John Larson, the analyst who performed the DNA testing, is the real witness against Dean; therefore, Dean's right to confrontation was violated. The State contends the facts here are distinguishable from *Smith* and *Hall-Haught*, because Dr. Logan reviewed the raw data and came to his own conclusions

---

[23] It is unclear whether the report Harris reviewed included the raw data.

[24] *State v. Lui*, 179 Wn.2d 457, 497-98, 315 P.3d 493 (2014) (holding expert witnesses could rely on technical data prepared by other analysts to reach their own conclusions).

based on that data. The State cites to several non-binding cases to support its contention that raw data generated by a machine cannot be testimonial or hearsay, but we are bound by Washington Supreme Court precedent. *State v. Watkins*, 136 Wn. App. 240, 241, 148 P.3d 1113 (2006). And, as the court in *Hall-Haught* indicated, it is not enough that Dr. Logan reviewed the testing and approved the results. *See* 4 Wn.3d at 822 (concluding the expert's opinion was testimonial even though the expert "supervised Krantz's work from the start of the case and also reviewed the sample testing before approving the release of the test results").

The State attempts to distinguish *Hall-Haught* and *Smith* by noting those cases did not distinguish between reports prepared by analysts and raw data. Justice Gonzalez addressed this issue in his concurrence: "Under *Smith*, are the results generated by the laboratory machines, the truthfulness of which the analyst relies on when authoring their report, also subject to the confrontation clause?" *Hall-Haught*, 4 Wn.3d at 827 (concurring opinion of Gonzalez, J.). Seemingly, this question is left unanswered by *Hall-Haught* as well.

While neither *Smith* nor *Hall-Haught* distinguish between reports and raw data, *Bullcoming* addressed the issue, and that case was not overturned by *Smith*. In *Bullcoming*, the court acknowledged the burden of requiring the analyst who performed the testing be the one to testify, but noted the State could avoid this by having the testifying expert re-test the sample, or engaging notice-and-demand procedures. 564 U.S. at 666.

Unless and until our Supreme Court makes a distinction between an

analyst's report and raw data, the confrontation clause requires the analyst who performed the testing to testify. Accordingly, Dean's right to confrontation was violated, and we must determine whether the error was harmless. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

To determine whether the error was harmless, we use the " 'overwhelming untainted evidence' " test. *State v. Flores*, 164 Wn.2d 1, 18, 186 P.3d 1038 (2008) (internal quotation marks omitted) (quoting *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005)). Under this test, "when the properly admitted evidence is so overwhelming as to necessarily lead to a finding of guilt, the error is harmless." *Flores*, 164 Wn.2d at 19. When the improperly admitted evidence was merely cumulative of properly admitted evidence, its admission was harmless. *Id.*

Here, the toxicology results indicating M.L. had ether in her system were cumulative of other evidence, and even without Dr. Logan's testimony, the admitted evidence overwhelmingly supported a finding of guilt. First, Dr. Kiesel also testified to smelling ether during M.L.'s autopsy. Dr. Kiesel did not perform a toxicology test, but he was personally familiar with the smell of ether and was confident in his identification. Dr. Logan's testimony expanded on the presence of ether in M.L.'s bloodstream, including the quantity and that it was combined with heptane. These results indicated the source of the ether was likely carburetor fluid or starter fluid. Without Dr. Logan's testimony, there was still evidence in the record that M.L.'s blood had ether in it at the time of her death.

But, even if the evidence was not cumulative, its absence would not have

impacted the outcome of the trial. First, the connection between Dean and the ether was attenuated. The State noted that products containing ether were found at Dean's residence when it was searched, but ether is commonly found in carburetor fluid, and the garage where the items were found was shared with other people in the house. Additionally, T.P.'s brother testified that they had carburetor cleaner in their garage in 1993; therefore, the substance was just as likely linked to T.P. as Dean.

Additionally, even without the toxicology results, substantial evidence in the record would lead any reasonable juror to reach the same verdict. Dean's DNA was a match to four different DNA profiles found on the clothing M.L. was wearing at the time of her death. Dean's DNA individually matched the profile developed from a blood stain on M.L.'s shorts, meaning the chance of finding the same DNA profile in a randomly selected person from the United States was 1 in 7.2 quadrillion.[25] Similarly, the DNA component of the semen stain on the crotch of M.L.'s shorts matched Dean; that partial profile can only be found in approximately 1 in 5,400 males in the United States. Dean also had known contact with M.L., he lived near where her body was found, and he initially denied knowing her when he spoke with law enforcement. For these reasons, we conclude that, even though Dean's right to confrontation was violated, the error was harmless.

<u>Cumulative Error</u>

Under the cumulative error doctrine, "a defendant may be entitled to a new

---

[25] "72" followed by 14 zeroes.

trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). The doctrine applies " 'where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal.' " *State v. Meza*, 26 Wn. App. 2d 604, 624, 529 P.3d 398 (2023) (quoting *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012)). But " '[w]here the evidence is overwhelming against a defendant,' cumulative error will not require reversal." *Meza*, 26 Wn. App. 2d at 624 (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 691, 327 P.3d 660 (2014)).

Here, only one error by the trial court occurred: allowing the testimony of Dr. Logan in violation of Dean's right to confrontation. But, as discussed *supra*, the error was harmless and did not affect the outcome of the trial. Because no other errors occurred, we conclude cumulative errors did not deprive Dean of a fair trial.

Community Custody

Dean and the State agree that Dean's community custody exceeds the statutory maximum, and the case should be remanded to strike the current term of community custody and impose placement consistent with RCW 9.94B.050(2)(b). We agree with the parties.

Under RCW 9.94B.050(2)(b),

> The court shall sentence the offender to a term of community placement of two years or up to the period of earned release awarded pursuant to RCW 9.94A.728, which is longer, for:
>
>     (b) A serious violent offense other than a sex offense committed on or after July 1, 1990, but before July 1, 2000.

A defendant's punishment may not exceed the penalty in place on the day the crime was committed.  *State v. Pillatos*, 159 Wn.2d 459, 475, 150 P.3d 1130 (2007).

Here, because Dean committed the offense in 1993, his community custody conditions should be imposed in accordance with RCW 9.94B.050(2)(b). We remand to strike the term of community custody and impose conditions consistent with RCW 9.94B.050(2)(b).

We affirm, but remand with instructions to correct the community custody conditions.

WE CONCUR: